No. 23-10841

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

William Martin and Michael Martin,

Plaintiffs–Appellees,

v.

Mauricio Duran and Bridget Doyle,

Defendants–Appellants.

On Appeal from an order of the
United States District Court for the Southern District of Florida
Case No. 20-cv-22107, Hon. Patricia A. Seitz

**BRIEF FOR APPELLEES**

Eliana Machefsky
Lauren Bonds
NATIONAL POLICE ACCOUNTABILITY
    PROJECT
2111 San Pablo Ave.
P.O. Box 2981
Berkeley, CA 94702
(314) 440-3595

Ariel Lett
LETT LAW, PLLC
6303 Blue Lagoon Dr.
Suite 400
Miami, FL 33126
(305) 912-5388
alett@lettlawfirm.com

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Appellees

July 24, 2023

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rules 26.1-1 and 26.1-3, this is an alphabetical list of judges, attorneys, persons, and firms with any known interest in the outcome of the case:

All Rise Trial & Appellate

Bonzon Keenan, Geraldine, Miami-Dade County Attorney's Office

Bonds, Lauren, National Police Accountability Project

Davy, Jim, All Rise Trial & Appellate

Doyle, Bridget, Defendant-Appellant

Duran, Mauricio, Defendant-Appellant

Goodman, Hon. Jonathan, U.S. Magistrate Judge

Lett, Ariel, Lett Law, PLLC

Machefsky, Eliana, National Police Accountability Project

Martin, Michael, Plaintiff-Appellee

Martin, William, Plaintiff-Appellee

Miami-Dade County, Defendant

Miami-Dade County District Attorney's Office

National Police Accountability Project

Seitz, Hon. Patricia A., U.S. District Judge

Vossler, Zach, Miami-Dade County Attorney's Office

No publicly traded company or corporation has an interest in the outcome of this appeal.

/s/ <u>Jim Davy</u>
Jim Davy

## STATEMENT REGARDING ORAL ARGUMENT

Appellees William and Michael Martin do not believe that oral argument is necessary to resolve this appeal. This is an interlocutory appeal of a routine denial of qualified immunity at the motion to dismiss posture, and Appellants present no new or novel questions of law. For the reasons Appellees discuss more fully in the following brief, this Court should simply affirm the District Court. To the extent that Appellants suggest the Court should hold oral argument to resolve ambiguity regarding the vitality of *Kingsland*, this Court recently addressed that question head on in its extensive opinion in *Williams*. *See* Section I.B.2, *infra*.

If this Court believes that oral argument would aid in its decisional process, however, Appellees are happy to participate and assist the Court.

# TABLE OF CONTENTS

**Page(s)**

Certificate of Interested Persons and Corporate Disclosure Statement.......................i

Statement Regarding Oral Argument ........................................................................ iii

Table of Authorities ....................................................................................................vi

Introduction.................................................................................................................1

Issues Presented .........................................................................................................2

Statement of the Case.................................................................................................2

I.    Factual Background ............................................................................................2

II.   Procedural History..............................................................................................5

Summary of Argument ................................................................................................6

Argument.....................................................................................................................8

I.    The District Court correctly found that the Martins plausibly alleged
      violations of clearly established rights to be free from false arrest and
      malicious prosecution. ......................................................................................8

      A.    The Martins plausibly alleged a violation of the clearly
            established right not to be arrested without probable cause. ....................8

            1.    The Martins plausibly alleged that Duran and Doyle did not
                  have even reasonable suspicion for the initial stop. ...........................9

            2.    The Martins plausibly alleged that Duran and Doyle did not
                  have even arguable probable cause to arrest them for any
                  criminal violation...............................................................................15

      B.    The Martins plausibly alleged a violation of their clearly
            established right to be free of malicious prosecution. ...............................20

            1.    Plausible allegations of lack of probable cause that support
                  false arrest claims also support malicious prosecution claims
                  as to the same event. ......................................................................21

            2.    This Court has recently clarified the standard for malicious
                  prosecution, which confirms the plausibly alleged violation
                  here....................................................................................................22

      C.    Both of these rights have long been clearly established. ...........................25

II.   The District Court correctly found that the Martins plausibly alleged
      violations of clearly established right to be free from excessive use of
      force. ................................................................................................................28

      A.    Because of plausible allegations of an absence of probable cause,
            any use of force was unreasonable. ..........................................................28

**TABLE OF CONTENTS—continued**

B. Even if there had been arguable probable cause, the amount of force was still unreasonable under the circumstances. ............................ 29

    1. William ............................................................................. 30

    2. Michael ............................................................................ 33

C. The right to be free from excessive force has long been clearly established. ........................................................................................ 35

III. Appellants' reliance on the body camera video does not change this analysis, and in fact supports the Martins' allegations ..................... 37

IV. Under the circumstances, Appellants' demand for qualified immunity is at best premature ............................................................................ 42

Conclusion ......................................................................................................... 46

Certificates ....................................................................................................... 1a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson ex rel. MA v. Vazquez,*
    813 F. App'x 358 (11th Cir. May 6, 2020) .............................................. 49

*Bashir v. Rockdale County,*
    445 F.3d 1323 (11th Cir. 2006) ......................................................... 32

*Beck v. Ohio,*
    379 U.S. 89 (1964) ........................................................................ 17

*Berry v. McGowan,*
    743 F. App'x 321 (11th Cir. 2018) ................................................ 18, 19

*Cantrell v. McClure,*
    805 F. App'x 817 (11th Cir. 2020) ...................................................... 42

*Chesser v. Sparks,*
    248 F.3d 1117 (11th Cir. 2001) ..................................................... 46, 47

*Childs v. Dekalb County,*
    416 F. App'x 829 (11th Cir. 2011) ..................................................... 28

*Corbitt v. Vickers,*
    929 F.3d 1304 (11th Cir. 2019) ......................................................... 47

*Cozzi v. City of Birmingham,*
    892 F.3d 1288 (11th Cir. 2018) ......................................................... 17

*Croom v. Balkwill,*
    645 F.3d 1240 (11th Cir. 2011) ......................................................... 16

*Davis v. United States,*
    512 U.S. 452 (1994) ....................................................................... 49

*Draper v. Reynolds,*
    369 F.3d 1270 (11th Cir. 2004) ..................................................... 35, 36

*Dukes v. Deaton,*
    852 F.3d 1035 (11th Cir. 2017) ......................................................... 32

*Duncan v. City of Sandy Springs,*
    No. 20-13867, 2023 U.S. App. LEXIS 14121 (11th Cir. Jun. 7, 2023) ................... 50

*Durkin v. Davis,*
    814 So.2d 1246 (Fla. Dist. Ct. App. 2002) .............................................. 26

*Eubanks v. Gerwen,*
    40 F.3d 1157 (11th Cir. 1994) ........................................................... 24

*Fils v. City of Aventura,*
    647 F.3d 1272 (11th Cir. 2011) ............................................. 33, 34, 36, 40

*Financial Sec. Assur., Inc. v. Stephens, Inc.,*
    500 F.3d 1276 (11th Cir. 2007) ......................................................... 41

*Florida v. Royer,*
    460 U.S. 491 (1983) ....................................................................... 16

*Fuller v. SunTrust Banks, Inc.,*
    744 F.3d 685 (11th Cir. 2014) ........................................................... 11

# TABLE OF AUTHORITIES—continued

Page(s)

*Glasscox v. City of Argo,*
 903 F.3d 1207 (11th Cir. 2018) .................................................................... 33

*Graham v. Connor,*
 490 U.S. 386 (1989) ........................................................................... 33, 49

*Harlow v. Fitzgerald,*
 457 U.S. 800 (1982) ...................................................................................... 48

*Hiibel v. Sixth Judicial Dist. Ct.,*
 542 U.S. 177 (2004) ........................................................................................ 9

*Hoefling v. City of Miami,*
 811 F.3d 1271 (11th Cir. 2016) .................................................................... 48

*Illinois v. Wardlow,*
 528 U.S. 119 (2000) ............................................................................... 15, 17

*Jackson v. Sauls,*
 206 F.3d 1156 (11th Cir. 2000) .................................................................... 28

*Jones v. Cannon,*
 174 F.3d 1271 (11th Cir. 1999) ............................................................... 23, 30

*Kingsland v. City of Miami,*
 382 F.3d 1220 (11th Cir. 2004) ..................................................... 6, 24, 25, 26

*Landsman v. City of Vero Beach,*
 621 F. App'x. 559 (11th Cir. 2015) ...................................................... 36, 38, 39

*Lee v. Ferraro,*
 284 F.3d 1188 (11th Cir. 2002) ............................................................ 17, 31, 32

*Lewis v. Governor of Ala.,*
 944 F.3d 1287 (11th Cir. 2019) ............................................................... 11, 20

*Luke v. Gulley,*
 50 F.4th 90 (11th Cir. 2022) ........................................................................ 25

*Luke v. Gulley,*
 975 F.3d 1140 (11th Cir. 2020) .................................................................... 23

*Manners v. Canella,*
 891 F.3d 959 (11th Cir. 2018) ...................................................................... 22

*Manuel v. City of Joliet,*
 580 U.S. 357 (2017) ...................................................................................... 27

*McAffee v. City of Clearwater,*
 No. 22-12320, 2023 U.S. App. LEXIS 8320 (11th Cir. Apr. 7, 2023) ..................... 27

*McCroden v. Bressett,*
 668 F. App'x 867 (11th Cir. 2016) ........................................................... 36, 38

*McDowell v. Gonzalez,*
 820 F. App'x 989 (11th Cir. 2020) ............................................................... 41

*Miller v. Harget,*
 458 F.3d 1251 (11th Cir. 2006) .................................................................... 28

## TABLE OF AUTHORITIES—continued

Page(s)

*Morris v. Town of Lexington,*
748 F.3d 1316 (11th Cir. 2014)..................................................................21

*Nieves v. Bartlett,*
139 S.Ct. 1715 (2019)...........................................................................24, 25

*O'Kelley v. Craig,*
No. 18-14512, 2019 U.S. App. LEXIS 32332 (11th Cir. Jul. 16, 2019)..................50

*Paez v. Mulvey,*
915 F.3d 1276 (11th Cir. 2019)............................................................22, 23

*Patel v. City of Madison,*
959 F.3d 1330 (11th Cir. 2020)..........................................36, 37, 40, 42

*Pourmoghani-Esfahani v. Gee,*
625 F.3d 1313 (11th Cir. 2010)..................................................................19

*Reid v. Georgia,*
448 U.S. 438 (1980)........................................................................14, 15

*Saunders v. Duke,*
766 F.3d 1262 (11th Cir. 2014)....................................................10, 39, 40

*Scott v. Harris,*
550 U.S. 372 (2007)..............................................................19, 42, 46

*Simmons v. Bradshaw,*
879 F.3d 1157 (11th Cir. 2018)..................................................................48

*Skop v. City of Atlanta,*
485 F.3d 1130 (11th Cir. 2007)............................................................28, 49

*St. George v. Pinellas Cnty.,*
285 F.3d 1334 (11th Cir. 2002)............................................................47, 48

*Stephens v. Giovanni,*
852 F.3d 1298 (11th Cir. 2017)....................................................32, 38, 49

*Stryker v. City of Homewood,*
978 F.3d 769 (11th Cir. 2020)..........................................33, 34, 35, 40

*Terry v. Ohio,*
392 U.S. 1 (1968)...........................................................................9, 16

*Thornton v. City of Macon,*
132 F.3d 1395 (11th Cir. 1998)............................................................28, 29

*United States v. Briggman,*
931 F.2d 705 (11th Cir. 1991)....................................................12, 13, 14

*United States v. Campbell,*
26 F.4th 860 (11th Cir. 2022) (en banc).......................................................50

*United States v. Gonzalez,*
969 F.2d 999 (11th Cir. 1992)..................................................................49

*United States v. Gonzalez-Zea,*
995 F.3d 1297 (11th Cir. 2021)............................................................12, 14

## TABLE OF AUTHORITIES—continued

**Page(s)**

*United States v. Hardy,*
   806 F. App'x 718 (11th Cir. 2020) ...................................................13, 14

*United States v. Hunter,*
   798 F. App'x 511 (11th Cir. 2020) ...................................................13, 14

*United States v. Ligon,*
   No. 21-11351, 2022 U.S. App. LEXIS 15982 (11th Cir. June 10, 2022).....12, 13, 14

*United States v. Mendenhall,*
   446 U.S. 544 (1980)...........................................................................15, 28

*United States v. Smith,*
   799 F.2d 704 (11th Cir. 1986)............................................................14, 15

*United States v. Sokolow,*
   490 U.S. 1 (1989)......................................................................................9

*United States v. Thompson,*
   712 F.2d 1356 (11th Cir. 1983)..................................................................28

*Von Stein v. Brescher,*
   904 F.2d 572 (11th Cir. 1990)....................................................................29

*Williams v. Aguirre,*
   965 F.3d 1147 (11th Cir. 2020).........................................22, 23, 24, 25, 26, 27, 30

*Williams v. State,*
   757 So. 2d 597 (Fla. Dist. Ct. App. 2000)....................................................44

*Wilson v. Attaway,*
   757 F.2d 1227 (11th Cir. 1985)...................................................................23

*Young v. Brady,*
   793 F. App'x 905 (11th Cir. 2019) ........................................15, 29, 30, 39

**Statutes**

Fla. Stat. § 784.07(2)(b) ..............................................................................17

Fla. Stat. § 843.01 .....................................................................................17

Fla. Stat. § 843.02 .....................................................................................18

## INTRODUCTION

In January 2018, Appellants Duran and Doyle stopped brothers William and Michael Martin without reasonable suspicion, based on Duran's improper profiling. Instead of giving the Martin brothers—walking to their car on the way out of a nearby gym, dressed in hoodies and basketball shorts, and one carrying a water bottle—an opportunity to explain their presence, Officer Duran accosted Michael, swept his legs, and slammed him to the asphalt. When William protested that this was assault, Officer Doyle tased him, twice—including once while he was already on the ground. On Appellants' motion to dismiss, the Court must accept the Martin Appellees' plausible, well-pleaded allegations. But the Court need not merely accept the allegations about that, as required. It can confirm the plausibility of the Martins' version of the events through Officer Doyle's body camera video ("the video").

When the Martins sued under Section 1983 for false arrest, malicious prosecution, and excessive force, the District Court correctly denied qualified immunity. It construed all the allegations in the complaint in favor of the Martins, as required; it refused to draw Duran and Doyle's improperly demanded inferences; and, after Duran and Doyle solely argued that their conduct did not violate the law at all rather than that law was not clearly established, the District Court held, correctly, that the Martins had plausibly pleaded violations of clearly established law as to all three claims. Applying qualified immunity on an interlocutory appeal of a motion to dismiss is especially inappropriate. This Court should affirm the District Court and remand for further proceedings.

1

## ISSUES PRESENTED

I.    Did the Martins plausibly allege violations of clearly established rights to be free from false arrest, malicious prosecution, and excessive force, supporting a denial of qualified immunity on the motion to dismiss?

Answer: Yes.

II.   Based upon the allegations in the complaint and properly incorporated exhibits, did Appellants lack even arguable probable cause to arrest the Martins for any offense?

Answer: Yes.

III.  Based upon the allegations in the complaint and properly incorporated exhibits, did Appellants use excessive force regardless of whether they had probable cause to believe the Martins had violated any law?

Answer: Yes.

## STATEMENT OF THE CASE

## I.    Factual Background

On January 10, 2018, William and Michael Martin left the gym after a workout to walk to their car. Doc. 30 at 3. They'd worked out at night, so it was dark when they left. Doc. 30 at 3. There were two parking lots near the gym—the parking lot to a closed police station, and an open, well-lit, public parking lot. The Martins had to walk past the police station lot to get to their car in the well-lit parking lot. They exhibited the signs of people having just left the nearby gym—they were wearing sweatshirts and basketball shorts; they carried their belongings in backpacks; Michael Martin was carrying a water bottle. Doc. 30 at 3.

As the Martins walked along the sidewalk, officer Mauricio Duran approached them. Duran wrote later that he watched them "due to the time of night," and because

they were "walking slowly" and "looking into the parked county vehicle[s]" in the police station parking lot. Doc. 30 at 4. The Martins deny walking through the police station parking lot at all, much less looking into any vehicles. But regardless, even Duran admits that the Martins continued their way to their car without touching anything or otherwise disturbing any cars in either lot. Doc. 30 at 4.

Although having passed the police lot without disturbing any property should have allayed Duran's initial suspicions, Duran decided to stop the Martin brothers, and called in backup. Doc. 30 at 4. Appellant Doyle joined him after the Martins had long since passed the police lot where Duran purportedly worried they might interfere with parked cars. Doc. 30 at 4. Nevertheless, Doyle and Duran approached them aggressively. Duran grabbed William Martin's arm; both William and Michael repeatedly explained that they were walking to their own car and wanted to be left alone, continuing to walk casually, neither stopping nor breaking into a run. Doc. 30 at 5. Neither Martin carried a weapon of any kind. Doc. 30 at 5.

When the Martins kept walking, Appellant Duran grabbed William's arm a second time. Michael turned to Duran and said, "If you touch him again, that's assault." Duran then immediately swept out Michael's legs and took him to the asphalt of the well-lit lot where the Martins had parked. Doc. 30 at 5. Duran then put Michael in a headlock. Doc. 19 at 02:51:08. After the aggressive takedown, William protested vehemently that Duran was engaging in assault. Doc. 30 at 5. William also tried repeatedly to explain that they were walking to their own car and minding their business, gesturing in the direction of their parked car and offering to produce his

3

keys. Doc. 30 at 5-6. And amidst all of this, even after Duran had slammed his brother to the ground, William did not physically interfere with Duran.

While William verbally protested what he viewed as Duran assaulting his brother, Appellant Doyle had a choice—evaluate William's lack of aggression and appropriately determine he did not pose a risk of danger or flight, or apply unnecessary force. Doyle chose the latter and tased William. Doc. 30 at 5. Upon being tased, William almost immediately toppled to the ground, falling backward and partly against Officer Duran and his brother Michael on the ground. Doc. 19 at 02:51:09. Seconds later, while William was still on his back and writhing in pain on the ground, Doyle tased William a second time. *Id*. at 02:51:12.

Around that point, more officers arrived. Ultimately, Appellants Duran and Doyle arrested both brothers on the scene, alleging that they had each violated three different laws: Battery on a Law Enforcement Officer, *see* F.S. § 784.07(2)(b); Resisting an Officer with Violence, *see* F.S. § 843.01; and Loitering or Prowling, *see* F.S. § 856.021. William and Michael Martin both spent time in pretrial detention, and they had felony charges hanging over their heads for months because they insisted on vindicating their rights at trial. Doc. 30 at 6. That was understandable, though: most of the foregoing events—everything from when Appellants Duran and Doyle approached the Martin brothers—were captured on Doyle's body-worn video camera. And so, in July of 2018, a jury found both brothers not guilty on all pending charges. Doc. 30 at 6.

4

## II.     Procedural History

In May 2020, William and Michael filed suit in District Court, ultimately filing an amended complaint asserting several claims under 42 U.S.C. § 1983. *See* Doc. 30. Against Defendants Duran and Doyle, they asserted claims for false arrest, excessive force, and malicious prosecution. Against Miami-Dade County, they asserted a *Monell* claim for failure to train and supervise Defendants Duran and Doyle.

The individual officer defendants moved to dismiss, asserting a qualified immunity defense. *See* Doc. 34. Miami-Dade also moved to dismiss. *See id*. In seeking qualified immunity, Duran and Doyle acknowledged that qualified immunity analysis contains two prongs, but avowedly made no arguments whatsoever as to the "clearly established" prong. *See generally* Doc. 34; *see also* Opening Br. at 7 (acknowledging that "they did not raise an express argument that any alleged violation was not clearly established").

While the District Court granted the County's motion—a decision that is not at issue in this appeal—the Court denied the Defendant-Appellants' motion, explaining that the allegations in the complaint, at this pre-discovery stage of the case, plausibly made out violations of clearly established law. *See* Doc. 49. Duran and Doyle appeal that denial of qualified immunity on an interlocutory basis.

5

## SUMMARY OF ARGUMENT

Here, the District Court correctly held that the Martins had plausibly alleged violations of clearly established rights to be free from false arrest, malicious prosecution, and excessive use of force. The District Court correctly denied qualified immunity from the false arrest and malicious prosecution claims because Appellants undertook their initial stop of the Martins without reasonable suspicion, and nothing during the stop created even arguable probable cause to arrest them for any offense under Florida law. Both false arrest and malicious prosecution claims based upon warrantless arrests ultimately turn on that question of probable cause, as this Court recently clarified in the wake of the U.S. Supreme Court's decision abrogating *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)—the very case Appellants relied upon at the District Court and again here. And based on the decisions of the Supreme Court and this Court, each of those rights has long been clearly established.

The District Court also correctly held that the Martins plausibly alleged violations of the clearly established right to be free from excessive use of force. This is correct because the Martins plausibly alleged that Appellants used force in the absence of even arguable probable cause. But even if there had been arguable probable cause to arrest Appellees on a minor offense, they also plausibly alleged that Appellant Duran's multiple takedowns of Michael and Appellant Doyle twice tasing William— including once while he was on the ground—were unreasonable and excessive under the known circumstances. That, too, violates clearly established law.

Although Appellants make much of the video that they attached to their motion to dismiss, the video only confirms the plausibility of the Martins' allegations. Courts

6

do not credit video over well-pleaded allegations unless the video blatantly contradicts those allegations. The Martins agree that the video is properly in the record in no small part because the video not only does not contradict their allegations, but supports them in virtually every important respect. Considering the video at all also underscores the numerous jurisprudential factors cutting against reversal at this stage of the case: first, the motion to dismiss posture; second, the fact-intensive nature of probable cause and excessive force claims even as compared to other § 1983 claims; and third, Appellants' forfeiting the clearly established issue in their motion to dismiss—which they may renew later in the case anyway.

## ARGUMENT

**I.    The District Court correctly found that the Martins plausibly alleged violations of clearly established rights to be free from false arrest and malicious prosecution.**

The Martins plausibly alleged violations of clearly established rights to be free from false arrest and malicious prosecution. Both of those claims turn on whether Duran and Doyle had probable cause to arrest the Martins. As plausibly alleged, and accounting for evidence incorporated by reference into the complaint and properly considered by the District Court, Duran and Doyle lacked reasonable suspicion at the time that they stopped the Martins. And as plausibly alleged, and accounting for evidence incorporated by reference into the complaint and properly considered by the District Court, Duran and Doyle lacked even arguable probable cause to arrest the Martins for any offense based upon how the circumstances unfolded. The right to be free from arrest without arguable probable cause has long been clearly established. And, contrary to Appellants' assertion, recent case law from this Court confirms that Appellees need not have alleged subsequent pretrial detention for their malicious prosecution claims to properly allege violations of clearly established law, too.

**A.    The Martins plausibly alleged a violation of the clearly established right not to be arrested without probable cause.**

The Martins' plausible allegations that they were arrested without probable cause, along with the video in the record that does not blatantly contradict those allegations, state a violation of clearly established law. The stop was flawed from the outset, when Appellant Duran lacked reasonable suspicion to stop them. But as the

complaint plausibly alleges, and the video supports, Duran and Doyle lacked even arguable probable cause to arrest either Martin brother for any offense.

1.    **The Martins plausibly alleged that Duran and Doyle did not have even reasonable suspicion for the initial stop.**

The stop here was flawed from the outset. An officer may only "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). To establish reasonable suspicion, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 27). The stop is only constitutional if supported by reasonable suspicion "at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 185 (2004) (cleaned up). Because Duran initiated his investigative stop of the Martins based on nothing but a mere hunch that the brothers, two Black men walking at night, were engaged in criminal activity, the stop violated the Martins' Fourth Amendment rights. Even Appellants' briefing makes this clear.

As an initial matter, although Appellants argue that six purported facts amount to the reasonable suspicion needed to stop the Martins, this Court may only properly consider four of them when considering Appellants' motion to dismiss. The Court is prohibited from considering the fifth and sixth factors Appellants cite—Duran's purported observation of the Martins (5) "walking slowly and looking into parked . . . vehicles" while (6) in the police department's parking lot. Opening Br. at 21. For one

thing, the Martins vehemently dispute that they were in the department's parking lot at all, let alone looking into parked vehicles, and they have plausibly alleged that Duran fabricated this narrative in his incident report in attempting to justify, retroactively, the illegal stop. *See* Doc. 30 at 13. But worse, Appellants' argument that the Martins incorporated Duran's incident report and its every statement into their complaint both misses the point and contravenes Circuit law. "Where a civil rights plaintiff attaches a police report to his complaint and alleges that it is false, as [Plaintiffs] did, the contents of the report cannot be considered as true for purposes of ruling on a motion to dismiss. Otherwise, officers sued under § 1983 could just attach police reports referenced in a civil rights complaint to their motions to dismiss and ask courts to consider the contents of those reports even if they contradicted the allegations of the complaint. And that, as we have said, would be improper." *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (reversing district court's dismissal of excessive force claim on qualified immunity grounds).

The procedural posture here matters. When ruling on a motion to dismiss, the Court only considers a document beyond the face of the complaint when "'[1] a plaintiff refers to a document in his complaint, [2] the document is central to his claim, [3] *its contents are not in dispute*, and [4] the defendant attaches the document to its motion to dismiss.'" *Id*. at 1271 (emphasis in original) (cleaned up) (quoting *Fuller v. SunTrust Banks, Inc*., 744 F.3d 685, 695-96 (11th Cir. 2014)). Because here, as in *Saunders*, the contents of Duran's incident report are obviously

in dispute, the content of the report was not properly before the District Court and is not properly before this Court.[1]

Beyond that, Appellants cited four other purported facts giving rise to reasonable suspicion. Construing all facts in favor of the non-moving Martins, as required by the posture, that falls apart quickly. Appellants say that: (1) the Martins were walking (2) at a late hour on a weekday, (3) while wearing "black hoodies and dark-colored shorts," and (4) the Martins declined to engage with Duran's aggressive questioning. Opening Br. at 20-21. But construing facts in favor of the Martins, they exited a gym, wearing exercise clothing, and were casually walking through the parking lot abutting the gym to their parked vehicle at approximately 2:45 in the morning. Doc. 30 at 3-5. The Martins each had a bag, and Michael Martin carried a bottle of water after working out. Doc. 30 at 4. The parking lot was brightly lit. Doc. 19 at 02:50:21; Opening Br. at 4 (acknowledging same). The Martins were not engaged in any apparent criminal activity when Duran stopped them, and they were on the sidewalk, far from any parked vehicles. Doc. 19 at 02:50:21. They did not appear nervous when Duran began asking them questions, nor did they make any attempt to flee. *Id.* at 02:50:32; *cf. United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991) (stopping

---

[1] Appellants cite *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) to support their argument that Duran's incident report must be accepted in full. But *Lewis* is inapposite. In *Lewis*, the plaintiffs misrepresented a quoted statement of the defendants that went to the heart of the litigation. *Id*. The defendant had explicitly stated in the second half of an omitted quote that he was not referring to the issue being litigated. *Id*. Because the Plaintiffs neither disputed the content of the full quote nor had any justification for their misrepresentation, the Court considered the full quote. *Id*.

someone who fled when the officers approached him). Instead, the Martins remained calm, and, following Duran's and Doyle's aggressive questioning, explained they were walking towards their parked vehicle, gesturing at its location. Doc. 19 at 02:50:45; 02:51:05. These facts do not give rise to a reasonable suspicion of criminal activity.

Appellants cite several cases to suggest that those facts could make out reasonable suspicion, but all are inapposite or distinguishable. One case involved officers on a pre-planned stakeout to surveil known, ongoing criminal activity. *United States v. Gonzalez-Zea*, 995 F.3d 1297 (11th Cir. 2021). There, officers staking out a house associated with a known ICE fugitive saw an individual leaving the home in the early hours of the morning. *Id*. at 1303. And the officers viewed the early hour not as evidence of criminal activity, but as an indication that the individual either lived in the house or knew the fugitive associated with it. *Id*. Another case involved an individual readily admitting to having violated the law, obviating the reasonable suspicion analysis entirely. *See United States v. Ligon*, No. 21-11351, 2022 U.S. App. LEXIS 15982 (11th Cir. June 10, 2022). The officers there had reasonable suspicion to conduct a stop not even because the suspect was walking in the roadway at nighttime near a murder site and matched the description of the murder suspect, but because he *admitted to* drinking alcohol and carrying an open container. *Id.* at *3. In other cases Appellants cite, officers were responding to called-in criminal activity that they reasonably suspected someone of having committed. *See United States v. Hardy*, 806 F. App'x 718, 721 (11th Cir. 2020) (officers responding to a 911 call were actively looking for a reported prowler and encountered someone who could not explain his presence); *United States v. Hunter*, 798 F. App'x 511, 518 (11th Cir. 2020) (officers

stopped an armed pedestrian late at night in the vicinity of a reported burglary). And in another case Appellants cite, the officers had reasonable suspicion to conduct a stop not because the suspect was in a commercial parking lot at 4:00 a.m., but because the businesses in that lot had been subject to multiple larcenies and robberies and the suspect attempted to flee when the officers approached him. *Briggman*, 931 F.2d at 709. Merely wearing dark clothing or walking at a late hour did not give rise to reasonable suspicion in any of those cases. Rather, it took an active stakeout, an admission of law-breaking, fleeing an area known for multiple burglaries and larcenies, or an active response to a reported crime to give rise to reasonable suspicion.

Here, Appellants' argument for reasonable suspicion boils down to profiling. Unlike the officers in the cases Appellants cite, Appellants do not—and cannot—say that Duran was investigating any reported wrongdoing, or engaged in a stakeout. *See Gonzalez-Zea*, 995 F.3d at 1303; *Hardy*, 806 F. App'x at 721; *Hunter*, 798 F. App'x at 518. The parking lot was not the site of repeated burglaries, and the Martins were neither armed nor attempting to flee. *See Briggman*, 931 F.2d at 709; *Hardy*, 806 F. App'x at 721. And the Martins certainly did not confess to any crimes. *Ligon*, 2022 WL 2091598, at *3. Instead, Appellants simply suggest that the Martins met the general profile of "prowlers" because they were wearing dark clothing while walking at night. But an officer's conclusion that an individual meets a particular criminal "profile," without any other indicia singling out the specific individual as suspicious, does not establish reasonable suspicion. *United States v. Smith*, 799 F.2d 704, 707 (11th Cir. 1986); *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980). In *Smith*, an officer

stopped a car that had not violated any traffic laws simply because the car fit "a drug courier profile." 799 F.2d at 707. The car had an out-of-state license and was driven by "two young men. . . traveling at 3:00 a.m." *Id*. This Court rejected the "drug courier profile" as a basis for reasonable suspicion, reasoning that "the few factors relied upon by [the officer] would likely apply to a considerable number of those traveling for perfectly legitimate purposes." *Id*.; *see also Reid*, 448 U.S. at 441 (reasoning that the profile used by the officers "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."). So too here. Duran saw two young Black men wearing dark hoodies and basketball shorts while walking late at night. Endorsing those facts as creating reasonable suspicion would subject "a large category of presumably innocent" people—perhaps, like the Martins, leaving the gym—to random seizures. *Id*. Appellants' capacious definition of "prowlers" cannot form reasonable suspicion.

Appellants' argument that the Martins' refusal to answer their questions contributed to reasonable suspicion fares no better. "A person approached by law enforcement is entitled to 'ignore his interrogator and walk away.'" *Young v. Brady*, 793 F. App'x 905, 912 (11th Cir. 2019) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Not fleeing matters because "flight is different from merely walking or driving away." *Id*. at 912 n.4; *see also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."). The Martins did not

14

appear nervous or flee, and instead continued calmly walking in the direction of their car. *See id.*; *see also Smith*, 799 F.2d at 707 (rejecting refusal to look to patrol car as basis for stop because, "to the extent that such an action is suspicious, it in no way gives rise to a *reasonable* suspicion of illegal activity either alone or in combination with the other circumstances") (emphasis in original)). On these allegations, no reasonable officer would believe they had reasonable suspicion to stop Appellees.

Appellants focus on out-of-record pre-stop context also reveals a separate problem. Even Duran's fabrications could give rise to reasonable suspicion for a stop to investigate potential loitering or prowling, the stop became unlawful because it exceeded that scope. *See Terry*, 392 U.S. at 20 (rejecting stop not "reasonably related in scope to the circumstances which justified the interference in the first place."). The stop was "required to cease once [Appellants'] . . . suspicions of [the Martins] were allayed." *Croom v. Balkwill*, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Appellants ignored the brothers' calm demeanors and explanation that they were simply walking to their parked vehicle. Instead, they unreasonably extended the stop and ultimately turned it into an unlawful arrest.

### 2. The Martins plausibly alleged that Duran and Doyle did not have even arguable probable cause to arrest them for any criminal violation.

Because the Martins plausibly alleged that Duran and Doyle lacked reasonable suspicion for the initial stop, Appellants argue that they acquired probable cause to arrest the Martins during the unlawful stop itself. But that fares no better, because the Martins have plausibly alleged that Appellants lacked probable cause to arrest

15

them for any offense. "A warrantless arrest is constitutional under the Fourth Amendment only when it is made with probable cause." *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293 (11th Cir. 2018) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Probable cause exists only "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). "Importantly, in evaluating probable cause, an officer may not unreasonably disregard certain pieces of evidence by choosing to ignore information that has been offered to him or her or electing not to obtain easily discoverable facts that might tend to exculpate a suspect." *Cozzi*, 892 F.3d at 1294 (cleaned up). Appellants lacked probable cause to arrest Plaintiffs for any offense, and thus violated the Martins' clearly established rights.

<u>Loitering/Prowling</u>

Because Appellants lacked even reasonable suspicion to stop the Martins for loitering or prowling in the first instance, they also lacked the higher standard of arguable probable cause needed to arrest the brothers for the same offense. *See Wardlow*, 528 U.S. at 123 ("[R]easonable suspicion is a less demanding standard than probable cause"). As discussed in Section I.A.1, *supra*, Duran and Doyle singled out the Martins simply because they were young Black men walking at night. And nothing that happened after the unjustified stop established probable cause. By contrast, every piece of information Appellants learned after stopping the Martins only demonstrated their innocence—the brothers were not nervous, they did not

16

attempt to flee or otherwise evade the officers, they were unarmed, and they explained they were merely walking to their parked car from the nearby gym. Duran and Doyle simply chose to ignore all that exculpating context. Under the totality of the circumstances, no reasonable officer could believe that the Martins had committed, or were about to commit, the crime of prowling or loitering.

<u>Battery and Resisting a Law Enforcement Officer with (or Without) Violence</u>

Appellants also lacked probable cause to arrest the Martins for Battery on a Law Enforcement Officer (Fla. Stat. § 784.07(2)(b)) and Resisting an Officer with Violence (Fla. Stat. § 843.01). Both crimes include an element of intent; § 784.07(2)(b) penalizes only those persons who "*knowingly* commit[] an assault or battery upon a law enforcement officer" and § 843.01 refers only to those who "*knowingly and willfully* resist[], obstruct[], or oppose[] an officer . . . by offering or doing violence to the person of such officer" (emphasis added). *See Berry v. McGowan*, 743 F. App'x 321, 325 (11th Cir. 2018) (denying qualified immunity at summary judgment to officer who arrested plaintiff for a violation of § 784.07(2)(b) where there was a factual dispute as to whether the plaintiff ever intentionally touched the officer). To the extent either Martin brother even touched Appellants, neither did so willfully. At no point during their encounter with Duran and Doyle did either brother threaten or initiate physical touch. Appellees only came into physical contact with Appellants upon the officers' own initiation of escalating force—Duran grabbed William's arm and slammed Michael to the ground; Doyle tased William, causing William to fall against Duran. Any reasonable officer would have seen that the Martins were calm,

17

unarmed, and showing their open palms, and thus not knowingly or willfully threatening to commit, or committing, any violence.[2]

The Martins agree that the body-worn camera footage is properly in the record before this Court, and that the Court can consider it even on the motion to dismiss. *See* Section III, *infra*. But court may only credit video footage over a plaintiff's well-pleaded allegations "where the video obviously contradicts Plaintiff's version of the facts." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372 (2007)); *see also* Section III, *infra*. But far from contradicting, the video only confirms that Plaintiffs did not commit willful or even inadvertent violence. The video shows the brothers calmly walking towards their vehicle while Michael asks, "What have I done, besides walk to my car?" Doc. 19 at 02:40:44 – 02:50:51. When Duran grabs Michael's arm a second time, William turns to Duran and says, "Yo, if you touch [Michael] again, that's assault."[3] *Id.* at 02:50:52

---

[2] For the same reason, Appellants did not have even arguable probable cause to arrest either brother for Resisting an Officer Without Violence (Fla. Stat. § 843.02). The Martins plausibly alleged, and the video does not blatantly contradict, that they were compliant, even answering Appellants' questions although they were not legally obligated to do so. *See Berry*, 743 F. App'x at 326 (acknowledging that a false arrest claim would fail if there were "probable cause . . . for any crime," but rejecting the officer's claim of arguable probable cause for resisting without violence because there were "unresolved factual questions whether" the plaintiff intended to resist at all).

[3] Appellants have grossly mischaracterized William's statement to mislead the Court. They selectively quote only the first half of Michael's statement, "Yo, if you touch him again—", to create the illusion of an implied threat of violence. Opening Br. at 26. But the video includes the full audio, which demonstrates that, to the contrary, William made no threat. William instead clearly stated his belief that *Duran* was committing an assault (or battery) against *Michael. See Lewis*, 944 F.3d at 1298 n.7 (penalizing litigant for selective and misleading quotation).

– 02:50:55. Duran responds by tackling Michael to the ground. *Id.* at 02:50:57. While Duran pins Michael to the ground, William stands with his arms outstretched, palms up, pleading with Duran, "Get off my brother. You can't assault. He didn't do anything wrong and you know!" *Id.* at 02:51:02 – 02:51:06. William points to the brothers' car, explaining, "Our car is right there!" and then turns back to Duran and Michael, palms still open. *Id.* at 02:51:07 – 02:51:08. Doyle then tases William. *Id.* at 02:51:09. While William is crying out in pain from being tased, Michael stands up from underneath Duran. *Id.* at 02:51:15. Once Michael breaks free from Duran's grip, he stands next to William, his arms down at his side and his palms open. *Id.* at 02:51:23 – 02:51:25. Duran then tackles Michael again. *Id.* at 02:51:26.

In other words, the video shows Michael attempting to free himself from Duran's tackle, and engaging in no intentional violence at all. In the few seconds Michael is free from Duran's grip, he stands with his palms open and arms down at his side. For his part, William does not touch either officer at any point, and solely and repeatedly pleads with the officers in a non-threatening manner, with his palms open. To the extent Appellants ask this Court instead to construe the footage in their favor and say that it blatantly contradicts the complaint, this Court must reject that request.

Accordingly, the Court's analysis cannot be "dictate[d]" by *Morris v. Town of Lexington*, 748 F.3d 1316 (11th Cir. 2014), as Appellants insist. Opening Br. at 28. In *Morris*, police officers illegally entered the plaintiff's house without a warrant. 748 F.3d at 1320. After unsuccessfully attempting to block the officers from entering, the plaintiff *punched an officer*. *Id*. Even though officers had violated the plaintiff's rights by entering the home without a warrant, they still had probable cause to arrest the

plaintiff for assault on a police officer. *Id*. at 1325. This is because, regardless of the unjust basis for the interaction, a plaintiff's violent response matters. In *Morris*, the plaintiff responded to the officers' Fourth Amendment violation with an intentional battery by punching an officer. *See id*. Here, by contrast, neither William nor Michael initiated any violent or physical contact with the officers at all. With the necessary element of Plaintiffs' intent to touch the officers absent in this case, no officer could conclude there was probable cause to initiate an arrest.

**B.    The Martins plausibly alleged a violation of their clearly established right to be free of malicious prosecution.**

Because the Martins plausibly alleged that Duran and Doyle arrested them without even arguable probable cause, the District Court correctly found that they had plausibly alleged a violation of their clearly established right to be free from malicious prosecution. Where, as here, civil rights plaintiffs allege a warrantless arrest, their ensuing malicious prosecution claim "rises or falls on whether there was probable cause for his arrest." *Manners v. Canella*, 891 F.3d 959, 968 (11th Cir. 2018) And although Appellants suggest that a 2004 case of this Court precludes the Martins' malicious prosecution claim, this Court has recently recognized that intervening Supreme Court precedent abrogated exactly the portions of that case upon which Appellants purport to rely, foreclosing their argument.

1.    **Plausible allegations of lack of probable cause that support false arrest claims also support malicious prosecution claims as to the same event.**

To plausibly allege a claim for malicious prosecution after a warrantless arrest, a plaintiff "must prove both a violation of his Fourth Amendment right to be free of unreasonable seizures and the elements of the common law tort of malicious prosecution." *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020) (Pryor, J.) (cleaned up) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)). In distilling and reconciling inconsistent precedents, the Court explained that "a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165; *see also Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (same). For warranted seizures or indictments, "the law is clearly established that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen if such false statements are necessary to the probable cause," and that applies to seizures without probable cause, which are not "supported as a warrantless arrest." *Williams*, 965 F.3d at 1168-69 (cleaned up) (citing *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999), *Paez*, 915 F.3d at 1287, and *Wilson v. Attaway*, 757 F.2d 1227, 1238 (11th Cir. 1985)).

Here, the Martins have plausibly alleged exactly the sort of malicious prosecution violation described by *Williams*, *Paez*, and this Court's recent case law. For the first prong of the malicious prosecution analysis, they alleged that they were stopped without reasonable suspicion and subjected to a warrantless arrest without probable

cause. *See* Section I.A.1-2, *supra*. For the second prong, they further alleged that Duran and Doyle falsified their incident reports to cause and support the Martins' prosecution. Doc. 30 at 13 (alleging that Appellants caused "police reports to be submitted to prosecuting authorities containing materially false statements and material omissions"). The sufficiency of those allegations under the precedent is clear—in a warrantless arrest situation like this one, those "false statements were necessary to the probable cause." *Williams*, 965 F.3d at 1168. Barring that, the Martins have plausibly alleged that they were arrested without probable cause as to any offense. *See* Section I.A.2, *supra*. And while *Williams* observed that plaintiffs might have a causation problem if officers were "responsible for *only* the warrantless arrest," *id.* at 1167 (emphasis added) (citing *Eubanks v. Gerwen*, 40 F.3d 1157, 1160-61 (11th Cir. 1994)), the Martins have alleged more than that—and in any event, Appellants have not raised an argument about intervening causes, nor did they below. *See generally* Opening Br.; *see also* Section IV, *infra*.

### 2. This Court has recently clarified the standard for malicious prosecution, which confirms the plausibly alleged violation here.

This Court's clarification of its malicious prosecution case law squarely forecloses key aspects of Appellants' arguments on this issue. Appellants insist that the Martins need to have alleged "a seizure after arraignment or indictment." *E.g.* Opening Br. at 33-36. But in doing so, they rely heavily—almost exclusively—on *Kingsland*, 382 F.3d at 1220. *See* Opening Br. at 34 (acknowledging reliance). But as *Williams*, *Paez*, and other cases have acknowledged, the precise aspects of *Kingsland* upon which

Appellants rely have been abrogated by the Supreme Court's intervening decision in *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019). First, the *Kingsland* Court's standard improperly required a malicious prosecution plaintiff to satisfy the elements of the Florida *state* law tort of malicious prosecution, rather than "the relevant common-law principles . . . that were well settled at the time of Section 1983's enactment." *Williams*, 965 F.3d at 1159 (quoting and discussing *Nieves*, 139 S.Ct. at 1726). Under the proper common law standard, the Martins have more than plausibly alleged their malicious prosecution claims. And second, although Appellants suggest that at least the post-arraignment aspect of *Kingsland* survives, that's wrong, too. In distilling the standard for malicious prosecution claims post-*Nieves*, this Court has explained that plaintiffs plausibly allege a violation of the clearly established right to be free of malicious prosecution based upon a warrantless arrest when an officer makes false statements in an arrest affidavit necessary to the probable cause that supports an ongoing prosecution, or when the officer engages in a warrantless arrest without probable cause. *Williams*, 965 F.3d at 1168-69.

First, this Court has recognized *Kingsland*'s abrogation. "Although we have at time looked to modern tort law when adjudicating claims of malicious prosecution under section 1983, *see, e.g.*, *Kingsland*, 382 F.3d at 1234 (examining Florida's modern approach to malicious prosecution . . . the Supreme court has clarified that the relevant common-law principles are those that were well-settled at the time of section 1983's enactment." *Williams*, 965 F.3d at 1159-60 (quoting *Nieves*, 139 S.Ct. at 1726); *see also Luke v. Gulley*, 50 F.4th 90, 96-97 (11th Cir. 2022) (discussing abrogation and describing reliance on state tort law elements as reversible error).

Because *Kingsland* addressed the elements of malicious prosecution under Florida state tort law, the *Williams* Court undertook a completely new analysis "after identifying the relevant common-law rule" in the context of "the constitutional provision at issue." *Williams*, 965 F.3d at 1160. *Kingsland*'s entire description of the elements of a malicious prosecution claim, and its application of law to facts, relies on a foundational mistake and has no vitality post-*Nieves*.

Second, the abrogation matters here because Appellants' rely on precisely the parts of *Kingsland*'s analysis that depended on Florida state tort law rather than enactment-era common law. *Kingsland* held that there were *six* "elements to support a claim of malicious prosecution," including, as relevant here, "damages as a result of the original proceeding." *Kingsland*, 382 F.3d at 1234 (citing *Durkin v. Davis*, 814 So.2d 1246, 1248 (Fla. Dist. Ct. App. 2002)). *Kingsland* also held, as relevant here, that "the judicial proceeding does not begin until the party is arraigned or indicted," *id.* at 1235, which explains Appellants' insistence on the need for post-arraignment detention. But both of those aspects of the decision were abrogated by *Nieves*' holding because, as *Williams* recognized, neither element had grounding in enactment-era common law. *Williams* distilled malicious prosecution down to two elements, *see* Section I.B.1, *supra*, and specifically discussed claim accrual and the injury. "Malicious prosecution . . . requires a seizure pursuant to legal process." *Williams*, 965 F.3d at 1157-58. And it resolved tension in the malicious prosecution doctrine in warrantless arrest cases in favor of *Manners* and *Skop* and against *Kingsland*, observing that the *Manners* and *Skop* rule under which "a malicious-prosecution claim turned on the constitutionality of a warrantless arrest that occurred before

24

arraignment or indictment . . . is compatible with the decisions in our line of precedents with an earlier origin." *Williams*, 965 F.3d at 1163-64. Under the circumstances, Appellants' reliance on *Kingsland* for an outdated rule fails.

Regardless, the Martins properly alleged a seizure even under the heightened *Kingsland* standard. A seizure pursuant to legal process "occurs," among other circumstances, "'when . . . a judge's probable-cause determination is predicated solely on a police officer's false statements.'" *Id.* at 1158 (quoting *Manuel v. City of Joliet*, 580 U.S. 357 (2017)). The Martins have not only alleged they were detained pretrial, but also that a judge found probable cause to hold them to answer based on Appellants' false statements. *See* Doc. 30 at 6; *cf. McAffee v. City of Clearwater*, No. 22-12320, 2023 U.S. App. LEXIS 8320 (11th Cir. Apr. 7, 2023) (holding no seizure pursuant to legal process where plaintiff's criminal charges were dismissed before a probable cause hearing and plaintiff was not detained pretrial). These circumstances meet even *Kingsland*'s abrogated standard for malicious prosecution claims.

## C.    Both of these rights have long been clearly established.

To the extent that this Court even considers the clearly established prong despite Appellants skipping it below, *see* Section IV, *infra*, it has long been "clearly established that a seizure without reasonable suspicion violates Fourth Amendment rights." *Childs v. Dekalb County*, 416 F. App'x 829, 832 (11th Cir. 2011) (citing *Mendenhall*, 446 U.S. at 554); *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006); *United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983)). Similarly, "binding precedent clearly established, at the time of [Plaintiffs'] arrest[s], that an arrest made

without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures." *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007); *see also Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998). When determining whether an officer is entitled to qualified immunity against false arrest and malicious prosecution claims, the Court asks "whether the officer had 'arguable' reasonable suspicion to support an investigatory stop," *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000), or "arguable probable cause" to make an arrest, *Skop*, 485 F.3d at 1144. An officer only has "'arguable probable cause' . . . where 'reasonable officers in the same circumstances and possessing the same knowledge . . . could have believed that probable cause existed to arrest' the plaintiffs.'" *Thornton*, 132 F.3d at 1399 (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).

As alleged, Appellants lacked reasonable suspicion or even arguable probable cause here. *See* Sections I.A.1-2. And the cited cases are more than enough to clearly establish the rights at issue. This Court's decision in *Young*, 793 F. App'x at 905, is instructive as to the applicability of those cases. The *Young* Court affirmed a denial of qualified immunity after the defendant officer stopped the plaintiff on suspicion of illegal palmetto berry harvesting. *Id.* at 913. The officer claimed he had arguable reasonable suspicion based on a loose criminal profile—the plaintiff was parked in the vicinity of illegal berry harvesting, during the height of harvesting season, with a bag in his truck bed—and because the plaintiff slowly drove away from the officer when initially approached. *Id.* at 910-12. The Court held that the profiling factors potentially pointing to palmetto harvesting were far too tenuous and that no "reasonable official at the scene" would have "believed that illegal palmetto berry

26

harvesting, or any other crime, was occurring." *Id.* at 913. The factual analysis of *Young* applies here, because Appellants relied upon nothing but a tenuous profile of a prowler and the Martins' attempt to "disinterestedly leav[e] [the] situation involving" Duran and Doyle. *Id.* But beyond the facts themselves, the Court held the plaintiff's right to be free from such a stop did not depend on past cases with identical facts. "[E]ven though there is no caselaw directly on point with the facts of this case, the general principle that a person can walk away from a mere police encounter is established by the caselaw, clearly applies here, and would give fair notice to Brady that Young waving him away and driving off was not enough to establish reasonable suspicion." *Id.* So even slightly less similar cases like *Smith*, *Reid*, or *Wardlow* put Appellants on notice that there was no reasonable suspicion to stop or arguable probable cause to arrest the Martins for prowling or loitering. Similarly, the "general principle" from *Berry* demonstrates that Appellants lacked probable cause to arrest the Martins for battery on a law enforcement officer or resisting an officer with (or without) violence. Where the only physical contact between the individual and the officer was initiated by the officer himself, the officer lacks probable cause. *Berry*, 743 F. App'x at 325.

The malicious prosecution claim plausibly alleges violations of clearly established law, too. "[T]he law is clearly established that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen if such false statements are necessary to the probable cause," and that applies to seizures without probable cause, which are not "supported as a warrantless arrest." *Williams*, 965 F.3d at 1168-69

27

(citing *Jones*, 174 F.3d at 1285). Because the Martins have plausibly alleged a false arrest violation of clearly established law based upon the absence of even arguable probable cause, they have alleged a violation of their clearly established right to be free of malicious prosecution, too.

## II. The District Court correctly found that the Martins plausibly alleged violations of clearly established right to be free from excessive use of force.

Appellants' request for qualified immunity on the Martins' excessive force claims finds even less support. For one thing, because the Martins plausibly pleaded that Duran and Doyle lacked reasonable suspicion to stop or probable cause to arrest them, *no* amount of force could be justified under the circumstances. But the Martins' excessive force claims, unlike their false arrest and malicious prosecution claims, do not rise and fall on the probable cause analysis. Even in police encounters that are arguably justified, officers can still use force that is unreasonable under the circumstances. And here, even if Duran and Doyle could get qualified immunity on the false arrest and malicious prosecution claims, the Martins would have a viable excessive force claim because they plausibly pleaded that the officers used an unreasonable amount of force in violation of clearly established law.

### A. Because of plausible allegations of an absence of probable cause, any use of force was unreasonable.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197. And "if an arresting officer does not have the right

to make an arrest, he does not have the right to use *any* degree of force in making the arrest." *Bashir v. Rockdale County*, 445 F.3d 1323, 1332 (11th Cir. 2006) (emphasis added). Because Appellants lacked probable cause to arrest the Martins, *see* Section I.A., *supra*, the District Court properly recognized that the Martins plausibly alleged that Appellants violated clearly established law by using *any* amount of force to effect the arrests.

### B.  Even if there had been arguable probable cause, the amount of force was still unreasonable under the circumstances.

Even if the Court believes that Appellants had arguable probable cause to arrest Plaintiffs during the encounter, the Martins have plausibly alleged that the amount of force Duran and Doyle used to effectuate those arrests was nevertheless excessive. "[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198; *see also Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) (same). Considering these factors based upon the allegations in the Martins' complaint and the video, it becomes especially clear that the Martins plausibly alleged that Defendants used excessive force in detaining them in violation of clearly established law. But excessive force cases are necessarily fact-intensive, even more so than other civil rights claims. *Stephens v. Giovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017)) (writing that "[e]xcessive-force claims are fact-specific; whether the force an officer uses is reasonable requires careful attention to the facts of each case" and quoting *Graham v. Connor*, 490 U.S.

29

386, 396 (1989)). Accordingly, Appellees undertake separate analysis for each Martin brother.

### 1.    William

Officer Doyle tased William at a moment when he posed no threat to anyone. And this Court has "repeatedly held that force was excessive when an officer tased a nonviolent and compliant suspect or one who had stopped resisting." *Stryker v. City of Homewood*, 978 F.3d 769, 778 (11th Cir. 2020) (Pryor, J., concurring) (citing *Fils v. City of Aventura*, 647 F.3d 1272, 1289-90 (11th Cir. 2011) and *Glasscox v. City of Argo*, 903 F.3d 1207, 1214-15 (11th Cir. 2018)). In *Fils*, a police officer tased the plaintiff, a patron at a nightclub suspected of disorderly conduct, without warning and after the plaintiff had put his hands up. 647 F.3d at 1288. When the plaintiff didn't immediately fall to the ground, a second officer tased him. *Id*. The plaintiff "did not swing his arms or in any other way resist arrest" between the first and second tasings. *Id*. The Court held that under those circumstances, both the first and second tasings were excessive. *Id*. at 1288-89.

Similarly, in *Stryker*, the Court held that a police officer used excessive force when he tased the plaintiff while responding to a routine auto accident. 978 F.3d at 771. The plaintiff "was afraid and tried to get away" but the officer "caught up and struck him multiple times in the face." *Id*. When the plaintiff reached his truck, he put his hands up on the dashboard "to show that he was not a threat and was not trying to escape," but the officer broke the truck's window and continued assaulting plaintiff. *Id*. at 772. This Court held that the District Court had improperly construed facts in

30

favor of the defendant officer at summary judgment and reversed the grant of qualified immunity. *Id.* at 775. The officer's use of the taser was objectively unreasonable because the plaintiff "was not resisting or fleeing" and "the crime at issue"—misdemeanor noncompliance with an officer's command—"was not severe." *Id.* at 774. As this Court explained, any conclusion that the plaintiff's noncompliance was "sufficiently severe under the circumstances to justify the use of force against him . . . conflicts with [11th Circuit] precedent." *Id.* (citing *Fils*, 647 F.3d at 1289)). The *Stryker* plaintiff had neither attempted to flee nor posed a danger to anyone at the moment he was tased, as he was merely trying to return to his truck. *Id.*

Here, the factors identified in *Lee*, *Dukes*, and other cases of this Court all cut in favor of holding that William plausibly alleged excessive force by Doyle even if Duran and Doyle had probable cause to arrest him. First, as in both *Fils* and *Stryker*, the crime that Appellants retroactively say they suspected William of having engaged in when Doyle tased him—prowling or loitering—is a minor, non-violent misdemeanor. *See Fils*, 647 F.3d at 1288; *Stryker*, 978 F.3d at 774. And even assuming, against the posture, that Doyle had reason to suspect William of noncompliance at the time she tased him, noncompliance with an officer's commands, as this Court has already held, is "not severe" and does not warrant the use of a taser. *Stryker*, 978 F.3d at 774.

Second, William did not pose any threat to Doyle or Duran when Doyle tased him. Doyle knew that William was unarmed, and William had made clear he did not want to engage physically with the officers. Immediately before Doyle tased William, William was standing over Duran's head while Duran pinned Michael on the ground. William had ample opportunity to strike Duran, but specifically did not do so.

31

Instead, William stood near Duran's head, his palms open and clearly empty, pleading with Duran to stop assaulting Michael. While William bent down slightly to check on his brother, it was obvious he was not trying to strike Duran, or even to pull Duran off Michael. Appellants cite *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), but unlike that case, William was not behaving erratically, pacing around belligerently, or making any furtive movements. *See id.* at 1278. Instead, as the plaintiffs in *Fils*, and *Stryker*, William had his hands where Doyle could see them and did not pose any danger. Appellants argue a very different version of the facts—that William pushed Doyle and was "coming up behind [Duran] to interfere with his attempts to subdue [Michael]." Opening Br. at 33. But that narrative is not supported by the video, and the video certainly does not blatantly contradict the allegations in the complaint. In any event, the Court is not permitted to resolve factual disputes in the officers' favor at this procedure posture. Construing the facts in the light most favorable to William, he did not pose any threat when he was tased.

Third, William was not attempting to flee or evade arrest when Doyle deployed her taser. Instead, William was standing, arms outstretched, near Duran and his brother. Moreover, neither William nor Michael had attempted to flee at any point leading up to the tasing.

Finally, regardless of the Court's sense of the constitutionality of Doyle's first use of her taser on William, her second use of the taser, while William was incapacitated on the ground, lying on his back and writhing in pain from the first taser shock, was clearly excessive. *See Fils*, 647 F.3d 1281 (firing a "second taser probe into [the plaintiff's] rib cage either when he had tensed up following [the] initial tase or after

[he] had fallen to the ground" violated the plaintiff's Fourth Amendment rights). *Cf. Draper*, 369 F.3d at 1278 (addressing only a *single* use of a taser on a belligerent suspect).

### 2.    Michael

Officer Duran swept out Michael's legs and slammed him to the asphalt despite Michael posing no threat to him at the time he did so. A takedown maneuver is a serious use of force that cannot be used against a non-violent, non-resisting suspect. *Patel v. City of Madison*, 959 F.3d 1330, 1342 (11th Cir. 2020); *Landsman v. City of Vero Beach*, 621 F. App'x. 559, 561 (11th Cir. 2015); *McCroden v. Bressett*, 668 F. App'x 867, 868 (11th Cir. 2016). Duran's use of a takedown maneuver on Michael, who was not resisting arrest and was merely requesting Duran let go of his brother's arm, was clearly excessive.

In *Patel*, police encountered a man who partially matched the physical description of a reported suspicious person, as he was "walking leisurely down the sidewalk." 959 F.3d at 1339. The plaintiff did not speak English but indicated to the officers through his gestures that he was simply walking in the direction of his home. *Id*. As the officers frisked the plaintiff, the plaintiff shifted his stance, and one officer responded by performing a leg-sweep takedown on the plaintiff. *Id*. On those facts, this Court rejected the officer's request for qualified immunity, holding that the unlawfulness of his conduct was clearly established—by both "a broader, clearly established principle" that "control[led] the novel facts in this situation" and by "obvious clarity"—at the time of his actions. *Id*. at 1343. First, the Court stated the broader principle "that a

33

police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Id*. (citing *Saunders*, 766 F.3d at 1265). Applying that, the Court concluded that a jury "could reasonably find" that an officer who "executed the swift and decisive leg sweep" of someone who "was not resisting and was complying with the officers' commands" had "knowingly violated this principle," *Patel*, 959 F.3d at 343. And second, recognizing precedent that "previously concluded that employing gratuitous force against a docile suspect can meet the 'obvious clarity' test," the Court concluded that "no reasonable officer could have thought that sweeping [the plaintiff's] legs out from under him and throwing him to the ground headfirst was a reasonable use of force." *Id*. at 1343-44 (citing *Stephens*, 852 F.3d at 1328).

In *Landsman*, this Court held that an officer who performed an "arm-bar takedown" on a non-aggressive suspect during a traffic stop could face liability. 621 F. App'x. at 561. The officer conducted the traffic stop in the parking lot of the plaintiff's apartment complex and never told the plaintiff why he had stopped her. *Id*. at 561. The plaintiff explained to the officer that she needed to use the bathroom and slowly moved away, attempting to enter her apartment, when the officer performed the takedown. *Id*. The Court found this use of force "unnecessary and disproportionate" because the plaintiff was suspected of a non-violent crime ("backing into the wall at a condominium complex"), did not "pose an immediate threat of serious harm" to anyone, and did not "actively resist or attempt[] to flee." *Id*. at 562-63. Here, as in *Landsman*, Duran even only purportedly suspected Michael of at most

a minor crime—prowling or loitering. *See* 621 F. App'x. at 561. Michael did not pose

any safety threat when Duran tackled him to the ground.

Appellants claim that Duran reasonably feared for his safety because Michael

raised his arms in apparent attempt to strike Duran, but this argument fails for three

reasons. First, on this posture, Appellants dispute this fact in their well-pleaded

complaint, and Doyle's body-worn camera footage is not inconsistent with Plaintiffs'

account. Second, one of the Martins observing that, "If you touch him again, that's

assault" cannot reasonably create fear for personal safety when he was otherwise

calm and non-aggressive. *See McCroden*, 668 F. App'x at 868 (affirming denial of

qualified immunity to an officer who had performed a takedown); *McCroden v. County

of Volusia*, No. 6:14-cv-1139-Orl-18KRS, 2016 U.S. Dist. LEXIS 200616 at *8 (M.D.

Fl., Feb. 18, 2016) (acknowledging that the plaintiff had "indisputably cursed at [one

of the medics] and raised his arms immediately prior to the Takedown."). Finally,

Michael was not attempting to evade arrest or otherwise flee. He was calmly walking

in the direction of his parked vehicle, as he told Duran. Under these circumstances,

it was clearly unreasonable for Duran to perform an aggressive takedown on Michael,

slamming him down.

### C.    The right to be free from excessive force has long been clearly established.

To the extent that this Court even considers the clearly established prong despite

Appellants failing to address it below, *see* Section IV, *infra*, the Martins' excessive

force claims properly allege a violation of clearly established law. "[A] police officer

violates the Fourth Amendment, and is denied qualified immunity, if he or she uses

gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders*, 766 F.3d at 1265. As discussed, this Court looks to "the general principle" of excessive force caselaw. *Young*, 793 F. App'x at 913. And "[t]here is a broad statement of principle ensconced in [the 11th Circuit's] case law that clearly establishes that the use of force against an arrestee who, *inter alia*, is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive." *Landsman*, 621 F. App'x at 563.

As discussed, this Court's decisions in *Fils* and *Stryker* foreclose Doyle's claim to qualified immunity for tasing William. The operable facts here line up with those in *Fils* and *Stryker*: William was a (1) "non-violent suspect[]"; (2) "accused of minor crimes"; (3) "who ha[d] not resisted arrest"; when (4) officer Doyle tased him. *Stryker*, 978 F.3d at 774. Both *Stryker* and *Fils* have "clearly established that using violent force generally, and a taser specifically, on a compliant, nonaggressive, and nonthreatening misdemeanant violates the Fourth Amendment." *Id.* at 775 (citing *Fils*, 647 F.3d at 1272).

Similarly, this Court's decision in *Patel* forecloses Duran's claim to qualified immunity for tackling Michael to the ground and putting him in a headlock. As in *Patel*, Duran performed a violent takedown maneuver on Michael, who was: not resisting or making threats, not informed about the reason for being stopped, suspected of a minor crime at most, and repeatedly pleading that he was simply trying to return to his vehicle. *See Patel*, 959 F.3d at 1343-44. Duran's use of the takedown under these circumstances was "gratuitous and excessive force," according

to clearly established law. *Saunders*, 766 F.3d 1262. Duran is not entitled to qualified immunity.

## III. Appellants' reliance on the body camera video does not change this analysis, and in fact supports the Martins' allegations.

Appellants submitted Defendant Doyle's body-worn camera footage as an exhibit in support of their motion to dismiss, and rely on it extensively in their Opening Brief to this Court. But the District Court correctly determined that the video only bolstered the plausibility of Appellees' allegations and the vitality of their claims. This is because the District Court correctly found that the video did not show any of the factors Defendant Duran claimed gave rise to his suspicion that criminal activity was afoot, Doc. 49 at 5-6, and correctly found no basis in the video to decide on the motion to dismiss posture that Defendants' actions after the stop were otherwise justified. Moreover, although Appellants attempt to use the video to create a fact dispute and then resolve that dispute in their own favor, longstanding law of the Supreme Court and this Circuit precluded the District Court from reaching Appellants' preferred conclusions. Because the video does not patently discredit the allegations in the complaint, it cannot displace those allegations. And on appeal, this Court does not cast a fresh eye over the video in the first instance. Because the District Court's description of the video is not blatantly contradicted by the video, this Court adopts that description for its analysis here.

As a preliminary matter, the Martins agree that it is appropriate for the District Court to have reviewed the video footage appended to Appellants' Motion to Dismiss, and that it is properly in the appellate record. *Financial Sec. Assur., Inc. v. Stephens,*

*Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (concluding the bodycam footage attached to Defendant's motion to dismiss was incorporated by reference in Plaintiff's complaint and could be considered by the Court)); *McDowell v. Gonzalez*, 820 F. App'x 989, 992 (11th Cir. 2020) (same). To be sure, at the motion to dismiss stage, video footage will only supplant allegations in the complaint if it patently discredits them. *Cantrell v. McClure*, 805 F. App'x 817, 819 n.2 (11th Cir. 2020) (citing *Scott*, 550 U.S. at 378). When video evidence is ambiguous, *see Patel*, 959 F.3d at 1333 (affirming denial of summary judgment where "neither the Court nor the video recordings c[ould] resolve the[] diametrically opposed accounts of what happened"), or when plausible allegations challenge the video's accuracy or completeness, *see Scott*, 550 U.S. at 378, then the Court must accept the complaint's allegations as true.

With that preface, Appellees welcome video review. Here, as the District Court found, the video does not blatantly contradict Martins' version of the events. In fact, it affirms their plausibility.

First, the video does not capture either Appellants' purported detection, observation, or knowledge of any possible criminal activity on the part of the Martins. Accordingly, nothing in the video blatantly contradicts the Martins' assertions that they were not engaged in any criminal activity when Defendant Duran approached them. What the video does show actually undermines Defendant Duran's later claim that he observed the Martins engaged in the suspicious activity of walking through a closed government parking lot and looking into cars. To the contrary, the start of the video shows all Parties in a seemingly open, brightly lit parking lot with no vehicles immediately nearby. Doc. 19 at 2:50:24.

38

Second, Appellants' conduct and statements in the video do not support their later-claimed suspicions. Neither Appellant articulates to the Martins what they have done wrong or why they are being stopped. Appellant Duran only deflects, saying "you're in the wrong place" and providing no further explanation or context. *Id.* at 2:50:39. Appellant Doyle vaguely echoes that they're in the wrong place. When William explicitly asks, "what have I done wrong except walk to my car?", both Appellants decline to answer and instead start harassing William about the location of his car. *Id.* at 2:50:43-54. The brothers plead with Appellants to explain what they did wrong after they are body-slammed, tased, and held in prone restraint, and the only thing Doyle says even then is that they are not listening and that they needed to stop. *Id.* at 2:51:30-52:04. Everything in the video only underscores the plausibility of the Martins' assertion that Appellants lacked reasonable suspicion, much less probable cause, to stop them. The video does not show any of the Martins' purportedly suspicious activity, and Appellants repeatedly failed to articulate why they were stopping the brothers.

Third, the video does not blatantly contradict the plausible allegations supporting the Martins' false arrest and related malicious prosecution claims. Nothing in the video shows the Martins engaged in any conduct that would supply arguable probable cause to arrest them for loitering and prowling. The video evidence similarly does not blatantly contradict the plausible allegations that Appellants lacked probable cause to arrest the Martins for battery on a law enforcement officer or resisting an officer with or without violence. Other than by misleadingly cutting one of William Martin's quotes in half, *see* n.3, *supra* at 18, Appellants have not pointed to any of the Martins'

words or conduct in the video that manifests the requisite intent that would even arguably meet the elements of either of these crimes.

Fourth, the video does not blatantly contradict the Martins' plausible allegations supporting their excessive force claims. As previously explained, the use of any force without probable cause would support a claim to be free from excessive force, and nothing in the video blatantly contradicts the Martins' allegations that Appellants had no legal justification to stop them in the first instance. However, even if the stop was lawful, the video shows that the Martins at no point engaged in any conduct that would have warranted Duran body-slamming Michael into the asphalt, or Doyle tasing William twice.

In seeking qualified immunity, Appellants argue without much elaboration that the Martins were resisting arrest and threatening their safety. But the video cannot support that argument. At no point in the video does either Appellant tell either Martin that they are under arrest prior to handcuffing them. By that time, both brothers were on the ground and not moving—or, put another way, not resisting. Accordingly, the video does not show Appellees under arrest and continuing to resist. *See Williams v. State,* 757 So. 2d 597, 599 (Fla. Dist. Ct. App. 2000) (under Florida law, an arrest requires "the following elements: (1) A purpose or intention to effect an arrest under a real or pretended authority; (2) An actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested; (3) A communication by the arresting officer to the person whose arrest is sought, or an intention or purpose then and there to effect an arrest; and (4) An understanding by the person whose arrest is sought that it is the intention of the

arresting officer then and there to arrest and detain him."). Nor does the video show either Appellee engaging in any behavior that threatened the safety of either Appellant. Appellant Duran had to catch up with Michael Martin before body-slamming him to the asphalt, because, as the video shows, William and Michael were walking away from Appellants toward their car.

Appellants also suggest that the Martins verbally threatened them when Michael stated, "If you touch him again, that is assault." Doc. 19 at 2:50:53-55. It is unclear how a descriptive characterization of Duran's repeated, unwanted touching as "assault" could constitute a threat. The video similarly does not show William engage in any threatening behavior between when his brother is body-slammed and when Appellant Doyle tased him. The camera is briefly blocked, but when the scene comes back into view, William is standing near Duran as Duran lays on top of Michael. While standing next to Duran, William pleads with Appellants that the brothers had done nothing wrong and then points out their nearby car. The only movements he makes prior to being tased are extending his arms with his palms to the sky, pointing at his car, and then bending down to look at his brother with his right arm limply extended. Doc. 19 at 2:51:00-09. He makes no furtive movements and says nothing that could be plausibly construed as a threat.

Nor does the video depict Michael displaying any threat to warrant Duran's second uncontrolled takedown and prone restraint hold. Quite the opposite. Immediately before the second takedown, Michael and Duran are not fully in the frame. But what can be seen of Michael shows him moving away from Duran and then standing next to his brother with his arms relaxed at his side and his palms

41

open. Within seconds, while Michael is still standing with relaxed arms, Duran takes Michael to the ground again. *Id.* at 02:51:23 – 02:51:26.

In all, nothing in the video blatantly contradicts the Martins' version of the facts underlying their excessive force claims. Rather than "utterly discredit[ing]" the Appellees' version of events, *Scott*, 550 U.S. at 380, the video evidence in this case tends to support it. As the District Court found, nothing in the video demonstrates that Appellants' stop, arrest, or use of force against the Martins was warranted—it shows Appellants engaged in racially biased, incompetent policing. Doc 49 at 7. It shows both Appellants out of control, frustrated that the Martins exercised their right to continue walking, and using unprofessional language. The video does not conclusively disprove the Martins' allegations, but rather, supports their version of the events.

## IV.  Under the circumstances, Appellants' demand for qualified immunity is at best premature.

As even Appellants' briefing demonstrates, jurisprudential factors cut against their demand for qualified immunity. While Courts may occasionally grant qualified immunity even at the motion to dismiss posture, it is "typically addressed at the summary judgment stage of the case." *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). This is especially true where defendants seek qualified immunity on fact-intensive claims—including, for example, the excessiveness of force—by disputing facts rather than posing pure questions of law. And even worse for their argument, Appellants not only seek qualified immunity at this early stage by creating and then resolving fact disputes in their own favor, but they do so after forfeiting, below, the

pure question of law that this Court looks for when resolving qualified immunity on interlocutory appeals from motions to dismiss. Depending on what comes out in discovery, qualified immunity may apply. But under the present circumstances, this Court should affirm and remand for further proceedings.

First, this Court only occasionally addresses issues of qualified immunity on the motion to dismiss stage. It "is typically addressed at the summary judgment stage of the case." *Chesser*, 248 F.3d at 1121. This is because "it is proper to grant a motion to dismiss on qualified immunity grounds" only when "the complaint fails to allege the violation of a clearly established constitutional right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). The question of whether the allegations make out a violation of clearly established law is a legal question reviewed *de novo*. *Id*. But that requires "accepting all the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor," and resisting a defendant's invitation to engage in weighing facts or evidence at the motion to dismiss stage. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). Indeed, the review is generally "limited to the four corners of the complaint." *Corbitt*, 929 F.3d at 1311 (citing *St. George*, 285 F.3d at 1337). And while Appellees acknowledge that this Court can—and should—peruse the video Appellants attached to their motion to dismiss, *see* Section III, *supra*, "on a motion to dismiss, [the Court] must construct [its] own firewall between the facts pleaded in the complaint and any evidence, construing the complaint in favor of the plaintiff," *Hoefling v. City of Miami*, 811 F.3d 1271, 1281-82 (11th Cir. 2016). As noted, where the video does not blatantly contradict the allegations, the complaint controls. *See* Section III, *supra*.

Second, to the extent that federal courts occasionally consider qualified immunity at the motion to dismiss stage, this case does not present such an occasion. Appellants seek early qualified immunity on fact-intensive issues. For one thing, they insisted at the District Court that they were entitled to qualified immunity because they never violated the Martins' constitutional rights *at all*—not because their conduct did not violate clearly established rights. *See Hoefling*, 811 F.3d at 1281-82; *St. George*, 285 F.3d at 1337; Opening Br. at 7 (acknowledging that "they did not raise an express argument that any alleged violation was not clearly established"). But the question of whether a violation has happened at all is often a fact-intensive inquiry—the type of inquiry disfavored for consideration at the motion to dismiss posture. *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For another thing, the claims at issue here are even more fact-intensive than other types of civil rights violations for which official defendants might seek qualified immunity, because they involve questions about the existence of probable cause and the excessiveness of force. Excessive force is a fact-intensive inquiry. *See Stephens*, 852 F.3d at 1315 (writing that "[e]xcessive-force claims are fact-specific; whether the force an officer uses is reasonable requires careful attention to the facts of each case" and quoting *Graham*, 490 U.S. at 396); *see also Anderson ex rel. MA v. Vazquez*, 813 F. App'x 358, 360 (11th Cir. May 6, 2020) (writing that "[t]he merits of excessive force claims are fact sensitive" and citing *Graham*, 490 U.S. at 396). So, too, is probable cause. *See Skop*, 485 F.3d at 1137 (writing that "the probable cause standard is . . . applied in a specific factual context and evaluated using the totality of the circumstances"); *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th

Cir. 1992) ("the determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis"). Because the claims at issue here do not allege policy-based or other less fact-intensive violations, qualified immunity is inappropriate here.

Third, to the extent that the second prong of the qualified immunity analysis presents a pure question of law, this Court should decline to reverse the District Court now on that basis, because Appellants skipped any clearly established law argument below. Even if this appeal came up on a more typical posture to seek qualified immunity, and even if the claims at issue were less fact-intensive by nature, this Court still disfavors affirming based upon arguments forfeited at the District Court. This is because "the refusal to consider arguments not raised is a sound prudential practice." *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring). This Court excuses an Appellant's failure to raise arguments below under five circumstances—none of which are present here. *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc). Appellants of course had the opportunity to argue at the District Court that the Martins had not plausibly alleged a violation of clearly established law, yet did not advance that argument. *Id*. And a decision from this Court declining to consider Appellants' forfeited argument for the first time on appeal would not result in a miscarriage of justice or transgress the interests of justice, *id*. because this appeal will hardly be the final word on Appellants' entitlement to qualified immunity. Appellants "may, of course, raise this qualified immunity defense again" after "the motion-to-dismiss stage." *Duncan v. City of Sandy Springs*, No. 20-13867, 2023 U.S. App. LEXIS 14121 at *13 (11th Cir. Jun. 7, 2023);

45

*see also O'Kelley v. Craig*, 781 Fed. App'x 888, 898 (11th Cir. 2019) (denying qualified immunity at the motion to dismiss stage but inviting the defendants "to raise the defense again in a motion for summary judgment").

Under the circumstances, Appellants do not present the best case for awarding qualified immunity on appeal at the motion to dismiss stage. They seek qualified immunity early in the case, as to civil rights claims involving notably fact-intensive inquiries into the excessiveness of force and the existence of probable cause. And they do so despite not arguing below the pure question of law that supports qualified immunity at motions to dismiss, without falling into any of the specifically delineated exceptions to this Court's jurisprudential preference against excusing forfeiture. Particularly because Appellants may raise qualified immunity again later in the litigation, applying it here is unwarranted.

## CONCLUSION

For all of the foregoing reasons, the order of the District Court should be affirmed.

Respectfully submitted,

                                           <u>/s/ Jim Davy</u>

Eliana Machefsky                             Jim Davy
Lauren Bonds                               ALL RISE TRIAL & APPELLATE
NATIONAL POLICE                      P.O. Box 15216
     ACCOUNTABILITY PROJECT     Philadelphia, PA 19125
2111 San Pablo Ave.                 (215) 792-3579
P.O. Box 2981                         jimdavy@allriselaw.org
Berkeley, CA 94702
(314) 440-3595

Ariel Lett
LETT LAW, PLLC
6303 Blue Lagoon Dr.
Suite 400
Miami, FL 33126
(305) 912-5388
alett@lettlawfirm.com

Counsel for Appellee

July 24, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,910 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.66.1, set in Century Schoolbook 12-point type.


<u>/s/ Jim Davy</u>

Jim Davy

**CERTIFICATE OF SERVICE**

I certify that on July 24, 2023, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

I further certify that, within the required time, I will file four paper copies of this brief with the Clerk of Court.

/s/ Jim Davy

Jim Davy